**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| SORRENTO THERAPEUTICS, INC., *et al.*,[1] | Case No. 23-90085 (DRJ) |
| Debtors. | (Jointly Administered) |
| OFFICIAL COMMITTEE OF EQUITY SECURITIES HOLDERS, | |
| Plaintiff. | Adversary Proceeding No. 23-03106 |
| v. | **APPLICATION FOR A TEMPORARY RESTRAINING ORDER** |
| BANK OF AMERICA SECURITIES, INC., MERRILL, LYNCH, PIERCE, FENNER & SMITH INCORPORATED, J.P. MORGAN SECURITIES LLC, MORGAN STANLEY & CO., LLC, PERSHING LLC, NATIONAL FINANCIAL SERVICES LLC, STATE STREET BANK AND TRUST COMPANY, AND UBS SECURITIES LLC, | |
| Defendants. | |

**EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND**
**PRELIMINARY INJUNCTIVE RELIEF**

Plaintiff the Official Committee of Equity Securities Holders (the "Equity Committee" or

"Plaintiff") of the debtors and debtors in possession (collectively, the "Debtors") in the above-

---

[1]   The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are:  Sorrento Therapeutics, Inc. (4842) and Scintilla Pharmaceuticals, Inc. (7956).  The Debtors' service address is:  4955 Directors Place, San Diego, CA 92121.

captioned Chapter 11 cases (the "Chapter 11 Cases")[2] files this application (the "Application") for an order (the "Proposed Order") substantially in the form attached hereto as **Exhibit A** issuing a temporary restraining order and preliminary injunction against the above-captioned defendants (the "Defendants").[3]  In support of this Application, Plaintiff respectfully states as follows:

**SUMMARY OF REQUESTED RELIEF**

The Equity Committee seeks a temporary restraining order and preliminary injunction pursuant to Sections 105(a), 362, and 362(k) of the Bankruptcy Code (a) ordering Defendants to close out all uncovered, naked short positions on all restricted Dividended Scilex Stock; (b) ordering Defendants to close out all uncovered, naked short positions on all Scilex Common Stock; (c) rescinding any pending naked short-sales of Dividended Scilex Stock and Scilex Common Stock; (d) enjoining all short-sales of Dividended Scilex Stock from the date the Court enters an order granting the relief requested herein through the close of the Chapter 11 Cases; (e) requiring Defendants to pay a penalty (the Equity Committee proposes $1.00 a day per share of Dividended Scilex Stock and unrestricted Scilex Common Stock to be deposited with the Registry of the Court for the benefit of the Debtors' estates ) if Defendants do not comply with this Order within five (5) business days, and; (f) ordering Defendants to provide an accounting of, and to disgorge, all profits received from naked short-selling, including all interest charged to naked short-sellers, by depositing such gains into the Registry of the Court within five (5) business days of the entry of this Order; and (g) ordering such other and further relief as the Court may deem just, equitable, and proper.

---

[2]     On February 13, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Unless otherwise noted herein, references to "Dkt. No." shall refer to the docket entries in the Debtors' lead bankruptcy case.

[3]     Plaintiff respectfully reserves the right to join additional defendants to this action.

2

The Equity Committee requests emergency consideration of the requested relief herein as it is essential to maximizing the value of the Debtors' Scilex stock, which is a vital asset to the Debtors' reorganization, and to immediately avert any abusive short-selling that is both prevalent and ongoing.

## INTRODUCTION

This matter concerns the pervasive and abusive "naked" short-selling – *i.e.,* taking a short position without correlating shares being located and borrowed by the short-seller – of the common stock of Scilex Holding Company ("Scilex") in violation of SEC regulations and established industry practices. The Debtors, which own a majority of Scilex stock, are victims of these illegal practices.  This action, brought by the estate fiduciary appointed to represent the Debtors' shareholders with the Debtors' approval, seeks relief against the defendant brokerage firms that have allowed illegal naked shorting of Scilex stock.

There have been a series of irregularities involving the Scilex stock since the Petition Date.  As set forth in their Rule 2004 Motion, the Debtors observed irregularities in the reported ownership of the Scilex stock in connection with the annual meeting of Scilex shareholders:  the reported beneficial ownership did not correlate to the reports issued by its proxy agent, Broadridge.

Accordingly, the Equity Committee filed a motion, which the Court granted, seeking to compel the brokerage firms trading in Scilex stock to credit all Dividended Scilex Stock (as defined below) to their customers' accounts and file a report with the Court detailing as to each customer account, on an anonymous basis, the number of shares of Dividended Scilex Stock credited and the quoted price of such stock on a mark-to-market basis.  Upon the filing of the

Debtors' and Equity Committee's motions, the trading prices of Scilex stock have spiked upwards without any ostensible explanation other than covering of short positions.

The certifications filed by the Defendants with this Court prove that there has been illegal naked shorting of the Scilex stock.  To obtain a legal short position, the short seller must "borrow" or "locate" freely tradable stock in the subject stock before closing the short sale.  However, *the reports provided by Defendants indicate that the short interest in Scilex stock totals millions of shares more  than the entire public float of approximately 3 million Scilex shares*.  The ineluctable conclusion is that these short positions resulted from illegal short-trading.

For instance, defendant Morgan Stanley maintains a handful of accounts that alone hold over 2.5 million short positions in Scilex stock.  As another example, just two accounts at defendant BofA Securities hold short positions of over 1 million Scilex shares *each*.  And perhaps most staggering, only *one* account at defendant Merrill Lynch holds a short position of over two million Scilex shares.

The Debtors' controlling interest in the Scilex stock is among their most valuable assets. But naked short-selling is causing artificial selling pressure on the Scilex stock, which has depressed the trading price of the security and increased the stock's volatility on the open market. The depressed price and increased volatility of the stock have, in turn, dampened the Debtors' ability to sell the Scilex stock or obtain financing based on the value of the Scilex stock.

The Court's intervention is therefore urgently needed to address this continuing threat to the overall value of the Debtors' estates and the eventual success of the Chapter 11 Cases.

<u>**JURISDICTION AND VENUE**</u>

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief sought herein are 11 U.S.C. §§ 105(a), 362 and Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## FACTUAL BACKGROUND

### I. The Scilex Dividend.

3. One of the Debtors' most significant assets is Debtor Sorrento Therapeutics, Inc.'s ("Sorrento") 52% equity interest in Scilex Holding Company ("Scilex"), a publicly traded company that resulted from a spinoff and dividend to Sorrento shareholders.

4. As of the Petition Date, Sorrento owned (i) approximately 59 million shares of Scilex common stock (the "Scilex Common Stock") and (ii) approximately 29 million shares of Scilex's Series A Preferred Stock (the "Scilex Preferred Stock"). These securities collectively had a market value of approximately $850 million on the Petition Date. *See Declaration of Mohsin Meghji, Chief Restructuring Officer of The Debtors, In Support of Chapter 11 Petitions* [Dkt. No. 5] at ¶ 12. Sorrento holds a majority of the aggregate voting power of Scilex stock.

5. Immediately following a merger involving Scilex in November 2022, Sorrento held a 96.2% interest in shares of Scilex Common Stock subject to a 180-day lockup agreement. Pursuant to the terms of that certain *Amended and Restated Registration Rights Agreement of Scilex, dated November 10, 2022*, Sorrento was restricted from transferring its shares of Scilex Common Stock until May 11, 2023 (the "Restriction Period"), subject to certain exceptions (including dividends).

6. On December 30, 2022, Sorrento announced a dividend to its shareholders of 76 million shares of Scilex Common Stock (the "Sorrento Dividend" and the shares so distributed, the "Dividended Scilex Stock"). The Sorrento Dividend occurred on January 19, 2023, and

reduced Sorrento's ownership interest in Scilex Common Stock from 96.2% to 42.5% (the Debtors continue to hold Scilex Preferred Stock, which provides the Debtors with a majority ownership and voting interest in Scilex).

7.     The Dividended Scilex Stock was primarily received by "record owners," or brokers, dealers, banks and other nominees acting as agents for shareholders who are the true "beneficial owners" of the stock.  These agents hold, in the aggregate, approximately 89.5% of the shares of Dividended Scilex Stock that were supposed to be ultimately transferred to the brokerage accounts of Sorrento shareholders.

8.     Sorrento shareholders who received the Dividended Scilex Stock were similarly restricted from transferring it until after the Restriction Period.  The Restriction Period, however, was subsequently extended by Court order in the Chapter 11 Cases to September 1, 2023.  *See* Dkt. No. 524.  Thus, at all relevant times, the Dividended Scilex Stock is not freely tradeable.

## II.     The Discrepancy in Reported Shares of Scilex Stock.

9.     On May 4, 2023, Scilex held its annual shareholder meeting.  The record date for shareholders entitled to receive notice of and vote at the annual shareholder meeting was March 6, 2023, and Scilex filed proxy materials with the SEC in advance as required by federal securities laws.

10.     In a highly unusual development, the proxy materials mandated to be delivered to beneficial owners of more than 44 million shares of Scilex Common Stock were never, in fact, delivered.  *See* Declaration of Stephen Ma, attached hereto as **Exhibit B** (the "Ma Declaration"), at ¶ 9.  The Debtors suspected that the brokers, dealers, banks and other nominees that act as agents for Sorrento shareholders failed to report their total shareholdings to Broadridge Financial

Solutions, Inc. ("Broadridge"), the entity designated to collect, verify, and tabulate shareholder votes for Scilex's annual meetings. *Id.* at ¶ 10.

11.     Soon thereafter, the Debtors obtained a report produced by Broadridge confirming what they suspected: a significant discrepancy between the number of shares held at top brokerage firms and the number of shares actually reported to Broadridge, the discrepancy being larger than the 3 million public share float. Ma Declaration at ¶ 11. This indicated, but did not prove, that there was widespread illegal naked short-selling of the Scilex Common Stock.

12.     Accordingly, on March 31, 2023, the Debtors filed a motion (the "Rule 2004 Motion") that sought, *inter alia*, an order compelling certain brokerages (the "Rule 2004 Firms") to provide written responses to various requests (collectively, the "Information Requests") on or before April 5, 2023. The Information Requests sought information regarding which Rule 2004 Firms had failed to report, or had underreported, the ownership of Scilex Common Stock so that the Debtors could seek to remedy such failure and its effect on Scilex's stock value.

13.     The Debtors believed that a substantial number of minority shareholders of Scilex may have been actually or functionally disenfranchised by the Rule 2004 Firms' failure to report all holdings of Scilex Common Stock and to deliver proxy materials in compliance with federal securities laws. Ma Declaration at ¶ 13. On April 11, 2023, the Court entered an order approving the Rule 2004 Motion.

14.     The Debtors received surprisingly few responses to their Information Requests from the Rule 2004 Firms and, based on information provided by the Debtors, the Equity Committee understands that nearly all responses were inadequate, incomplete, and/or did not resolve the uncertainties surrounding the reporting of Scilex Common Stock. Ma Declaration at ¶ 14.

15.     In response to these events, the Debtors and the Equity Committee agreed that the Equity Committee should investigate the foregoing reporting deficiencies and take additional measures to rectify what appeared to be abusive naked short-selling practices that would be artificially depressing the value of the Scilex Common Stock and the Debtors' estates.

**III.     The Equity Committee's Motion to Compel**
**Compliance from the Brokerage Firms.**

16.     On May 11, 2023, the Equity Committee, with the support of the Debtors, filed the *Official Committee of Equity Securities Holders' Emergency Motion Seeking to Compel Certain Brokerage Firms' Compliance with Various Regulatory Requirements* [Dkt. No. 594] (the "Motion to Compel") seeking to compel select brokerage firms (the "Brokerage Firms") to ensure that all Dividended Scilex Stock had been properly recorded and segregated in their customers' accounts in compliance with applicable regulatory requirements.

17.     On May 12, 2023, the Court entered the *Order Compelling Brokerage Firms' Compliance with Various Regulatory Requirements* [Dkt. No. 609, and, as amended, Dkt. No. 681] (the "Order").

18.     The Order partially granted the Motion to Compel and, *inter alia*, directed the Brokerage Firms to "credit all Dividended Scilex Stock to their customers' accounts"  and to "file a report with the Court detailing as to each customer account, on an anonymous basis, the number of shares of Dividended Scilex stock credited and quoted price of such stock on a mark-to-market basis" by no later than May 23, 2023.[4]  *See* Order ¶ 2(a).

---

[4]     The Equity Committee received several requests from various Brokerage Firms for extensions of the deadline to comply with the Order Compelling Compliance.  The Equity Committee generally granted such extension requests, the latest of which expired on June 7, 2023.

19.    The Order further provides that the Equity Committee is entitled to "seek additional relief, whether by contested matter or adversary proceeding, as appropriate after reviewing the responses required under Paragraph 2.a." of the Order.  *See* Order ¶ 8.

## IV.    Brokerage Firm Responses to the Order Reveal Evidence of "Naked" Short-Selling.

20.    "Naked" short-selling occurs when a seller of securities does not borrow or arrange to borrow such securities in time in time for delivery to the Clearing Corporation (the "Clearinghouse") by the trade date plus two days ("T+2").  When one party does not deliver shares to the Clearinghouse within T+2 settlement days, then a settlement failure may occur.  This "fail-to-deliver" is documented as a delivery obligation in the Clearinghouse account of the broker–dealer that executed the trade.  *See* Declaration of Dr. John W. Welborn, attached hereto as **Exhibit C** (the "Welborn Declaration"), at ¶ 6.  In other words, failure to deliver securities through naked short-selling allows traders to sell securities that they do not actually possess.

21.    According to the SEC, "'Naked' short selling…can have negative effects on the market.  Indeed, fraudsters may use "naked" short selling as a tool to manipulate the market."[5] Furthermore, research has shown that shown that securities with high and/or persistent fails-to-deliver tend to experience depressed stock prices in the form of negative abnormal returns.  *See* Welborn Declaration at ¶ 7.

22.    Regulation SHO was specifically enacted by the SEC to stop naked short-selling practices. As the SEC has explained in published guidance for Regulation SHO:

> Rule 200(g) requires that a broker-dealer to mark all sell orders of any equity security as "long," "short" or "short exempt." A sell order may only be marked "long" if the seller is "deemed to own" the security being sold and either: (i) the security to be delivered is in the physical possession or control of the broker or dealer; or (ii) it is reasonably expected that the security will be in the physical possession or control of the broker or dealer no later

---

[5]    *Key Points About Regulation SHO* (https://www.sec.gov/investor/pubs/regsho.htm).

than the settlement of the transaction. The "short exempt" marking requirement applies only with respect to the short sale price test restriction.

Rule 203(b)(1) generally prohibits a broker-dealer from accepting a short sale order in any equity security from another person, or effecting a short sale order in an equity security for the broker-dealer's own account, unless the broker-dealer has: borrowed the security, entered into a bona-fide arrangement to borrow the security, or reasonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due.[6]

Rule 204 . . . address[es] concerns that fails may create a misleading impression of the market for securities. Large and persistent fails to deliver may have a negative effect on shareholders, potentially depriving them of the benefits of ownership, such as voting and lending. Thus, by facilitating the prompt receipt of shares, Rule 204 . . . enable[s] investors to receive the benefits associated with share ownership.[7]

23.     The Equity Committee has carefully reviewed the responses received from the Brokerage Firms to date, including the responses submitted by the Defendants (such responses, the "Broker Reports").  The Broker Reports submitted by the Defendants confirm the Debtors' and Equity Committee's concerns that many of the Brokerage Firms are not complying with Regulation SHO, and that abusive "naked" shorting of the restricted Dividended Scilex Stock is occurring in the market.  Indeed, the Broker Reports submitted by the Defendants demonstrate continued selling pressure on the stock and show the aggregate short interest actually exceeds the current float of Scilex stock in the market.  *See* Welborn Declaration at ¶ 10.  This indicates that there is rampant (i) naked short selling of the Dividended Scilex Stock shares, and/or (ii) naked short selling of the unrestricted Scilex Common Stock.

---

[6]     *SEC Division of Market Regulation: Responses to Frequently Asked Questions Concerning Regulation SHO* (https://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm).

[7]     *Amendments to Regulation SHO, Securities and Exchange Commission,* Release No. 34-60388; File No. S7-30-08, Effective July 31, 2009. (https://www.sec.gov/rules/final/2009/34-60388.pdf)

**V.     The Debtors, and by Extension Plaintiff, Have Suffered Significant Harm as a Result of the "Naked" Short-Selling.**

24.     The Debtors have suffered significant harm as a result of the naked short-selling of Dividended Scilex Stock.  *See* Ma Declaration at ¶¶ 18-19.  As explained herein, Sorrento's Scilex stock holdings constitute one of the Debtors' most significant assets.

25.     Following the filings of the Rule 2004 Motion and the Motion to Compel, both of which aimed to uncover any potential short-selling of the Dividended Scilex Stock, the price of the Scilex Common Stock underwent drastic and uncharacteristic fluctuations.

26.     The following chart exemplifies the volatility of Scilex's stock price during the period from March, 29, 2023, two business days prior to the filing of the Rule 2004 Motion through April 13, 2023, two business days after the order approving the Rule 2004 Motion was entered:



27.     The following chart exemplifies the volatility of Scilex's stock price during the period from May 9, 2023, two business days prior to the filing of the Motion to Compel, through May 16, 2023 two business days after the Order was entered:



28.     There was no reported news during these two timeframes that would otherwise be expected to drive such volatility in the Scilex stock price.  Thus, the spike in the trading price of the stock was likely due to covering of short positions.

29.     It is clear from the short positions reported by Defendants in their responses to the Court's Order, as well as the complete lack of response from many other Brokerage Firms, that the *in terrorem* effect of the Debtors' Rule 2004 and the Equity Committee's Motion to Compel has not succeeded in correcting the pervasive naked short selling of the Dividended Scilex Stock and the unrestricted Scilex Common Stock.

30.     The depression of the Scilex Common Stock price effectively artificially devalues one of the Debtors' most valuable assets, which in turn hinders the Debtors' ability to obtain a value-maximizing stock price as the Debtors seek to monetize its shares of Scilex Common Stock and/or Scilex Preferred Stock through a sale during the bankruptcy or through a plan of reorganization.  *See* Ma Declaration at ¶¶ 19-20.

31.     Accordingly, the Equity Committee seeks to quash once and for all the illegal naked short-selling of Scilex Common Stock and Dividended Scilex Stock.

## **ARGUMENT**

### I.     **Legal Standard.**

32.     Plaintiff seeks a temporary restraining order and preliminary injunction pursuant to Sections 105(a), 362 and Rule 7065 of the Bankruptcy Rules for the purpose of restoring the status quo and preventing irreparable harm to the Debtors stemming from the naked short-selling of Scilex stock.

33.     To obtain such relief, the Equity Committee as the moving party must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury to the moving party; (3) the threatened injury outweighs any damages the injunction may cause defendant; and (4) the injunction is in the public interest. *See Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014).  *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 764 (5th Cir. 1995) ("When issuing a preliminary injunction pursuant to its powers set forth in section 105(a), a bankruptcy court must consider the traditional factors governing preliminary injunctions issued pursuant to Federal Rule of Civil Procedure 65.") (quotation marks omitted).  "[N]one of the four prerequisites has a fixed quantitative value," but rather a "sliding scale is utilized, which takes into account the intensity of each in a given calculus." *State of Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975).

34.     Thus, in applying the four-part test, the Court must conduct "a delicate balancing," which weighs "the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury that possibly could flow from the denial of preliminary relief." *Id*. Ultimately, whether to grant a request for a temporary restraining order "is within the sound

discretion" of the Court.  *Greater Houston Transp. Co. v. Uber Technologies*, 155 F. Supp. 3d 670, 704 (S.D. Tex. 2015).

## II.     The Equity Committee is Likely to Prevail on the Merits of Its Claims.

### A.     The Illegal Naked Shorting of Scilex Stock Affects and Involves Property of the Debtors' Bankruptcy Estate and Violates the Automatic Stay.

35.      Temporary relief is only inappropriate "if there is no chance that the movant will eventually prevail on the merits." *Seatrain Int'l, S.A.*, 518 F.2d at 180.  But a moving party "is not required to prove to a moral certainty that his is the only correct position." *Id.  See also Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979) ("A preliminary injunction may issue . . . despite the existence of a plausible defense, as long as the movant demonstrates a substantial likelihood of success.").  Indeed, "[a]s long as the court cannot say there is no likelihood of prevailing on the merits but finds the factor of substantial likelihood of success present to some degree, then the party seeking the injunction has met its burden." *Family Rehab., Inc. v. Azar*, 2018 WL 3155911, at *3 (N.D. Tex. June 28, 2018) (citing *Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980)).

36.      The Equity Committee is likely to prevail on the merits of its request as the illegal naked shorting of Scilex stock affects and involves property of the Debtors' bankruptcy estate and violates the automatic stay.  As this Court is well aware, a debtor's bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).  This includes "all kinds of property, including tangible or intangible property[.]" *In re MortgageAmerica Corp.*, 714 F.2d 1266, 1275 (5th Cir. 1983) (citations and quotation marks omitted).  Significantly for present purposes, "[t]he broad definition of property of the estate clearly encompasses a debtor's interest in another corporation's stock." *Geltzer v. Soshkin (In re Brizinova)*, 588 B.R. 311, 326 (Bankr. E.D.N.Y. 2018) (quotation marks omitted).

*See In re Arcapita Bank B.S.C.(C)*, 2014 WL 2109931, at *2 (Bankr. S.D.N.Y. May 20, 2014) (same).

37.     The automatic stay, moreover, operates as an injunction against all entities from, *inter alia*, any act to "exercise control over property of the estate[.]" 11 U.S.C. § 362(a)(3). Crucially, "the [Section 362(a)] statute's terms . . . 'exercise control' indicate that a wide spectrum of acts are stayed." *In re Wright*, 578 B.R. 570, 587 (Bankr. S.D. Tex. 2017) (citing *In re Allentown Ambassadors, Inc.*, 361 B.R. 422 (Bankr. E.D. Pa. 2007)).  *See also In re Trevino*, 535 B.R. 110, 146 (Bankr. S.D. Tex. 2015) (explaining that in the Section 362(a) context "control" has been defined to mean "to exercise power or influence over" or "to regulate or govern").  Thus, in analyzing whether a party is exercising control over intangible estate property, courts must consider (1) the nexus between the conduct at issue and the property interests of the bankruptcy estate, (2) the degree of impact on the bankruptcy estate and (3) the competing legal interests of the non-debtor parties. *See Allentown Ambassadors, Inc.*, 361 B.R. at 440.

38.     Here, the Defendants' allowance and facilitation of illegal naked short-selling of Scilex stock is a clear act to "exercise control" of the Debtors' estate in violation of the automatic stay.  First, for the reasons stated above, uncovered or "naked" short positions and a continued prevalence of naked short-selling of Scilex stock indisputably involve "equitable interests of the debtor in property" as a matter of law.  *See* 11 U.S.C. § 541(a)(1) (providing the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case").  Second, the abusive, naked short-selling of Scilex stock continues to significantly diminish that stock's market value, thus impairing the value of the Debtors' estates and threatening to hinder the Debtors' reorganization prospects.  Put more simply: the Debtors' value is *directly linked* to their equity ownership interests in Scilex.  Third, the Defendants have no competing legal interests

whatsoever as they are merely brokers, dealers, banks and other nominees acting as agents for shareholders, who are the true "beneficial owners" of Scilex stock.  Indeed, it is only the Debtors, by virtue of their ownership interests, who have legal interests at stake.

39.    Accordingly, the Equity Committee is likely to succeed on the merits of their claims because the assets to be protected by the injunctive relief sought undoubtedly constitute property of the estate over which the Defendants are illegally "exercis[ing] control" as a matter of law.  11 U.S.C. § 362(a)(3).  Preliminary injunctive relief is thus warranted.[8]

**B.    Sanctions and Punitive Damages Are Warranted Due to Defendants' Violations of the Automatic Stay.**

40.    Because Plaintiff is likely to prevail on the merits of its claims, sanctions and punitive damages are appropriate.  Section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  Pursuant to this authority, this Court has explained it may enforce the provisions of Section 362 by "invok[ing] its civil contempt powers pursuant to § 105(a) because the automatic stay [is] imposed pursuant to a court order." *In re Sanchez*, 372 B.R. 289, 309 (Bankr. S.D. Tex. 2007).  The automatic stay "is a self-executing injunction, and therefore for contempt purposes it constitutes an order of the bankruptcy court." *Id*. at 312.  In other words, "the Court may issue sanctions under § 105(a) for contempt of an order imposing an automatic stay." *Id*. *See Angelo Pro Hockey Club, Inc.*, 292 B.R. 118, 124 (Bankr. N.D. Tex.2003) (same); *American Airlines Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000) ("Judicial

---

[8]    Plaintiff also notes that for this prong, courts have held the "success on the merits is to be evaluated in terms of the likelihood of a successful reorganization." *In re Bestwall LLC*, 606 B.R. 243, 254 (Bankr. W.D.N.C. 2019); *In re Sudbury*, 140 B.R. 461, 466 (Bankr. N.D. Ohio 1992) (same).  Here, abusive naked short-selling that is significantly diminishing the market value of Scilex stock certainly affects the Debtor's reorganization efforts as Sorrento's ownership interest in Scilex is one of the Debtors' most valuable assets.  This is especially true as the Debtors are actively exploring monetizing the Debtors' shares of Scilex Common Stock and/or Scilex Preferred Stock through a sale during the bankruptcy or through a plan of reorganization. *See Order Approving One or More Sales for Scilex Stock and Procedures Related Thereto* [Dkt. No. 542].

sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.").

41.      Further, Section 362(k) of the Bankruptcy Code provides that "an individual injured by any willful violation of a stay . . . shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, *may recover punitive damages*."  11 U.S.C. § 362(k) (emphasis added).  *See In re Preferred Ready-Mix LLC*, 2022 WL 16952650, at *3 (Bankr. S.D. Tex. Nov. 14, 2022) ("[T]he Fifth Circuit has noted that a corporate debtor fell within the definition of an individual [for purposes of Section 362(k)].") (citing *Matter of Community Home Financial Services Corporation*, 32 F.4th 472, 487 (5th Cir. 2022)).  The Fifth Circuit has identified three elements that must be present for an individual – *i.e.*, the Debtors – to recover for a willful violation of an automatic stay: "(1) the defendant must have known of the existence of the stay; (2) the defendant's acts must have been intentional; and (3) these acts must have violated the stay."  *In re Chesnut*, 422 F.3d 298, 302 (5th Cir.2005).

42.      Here, imposing sanctions and punitive damages against the Defendants is warranted.  Foremost, illegal and abusive naked short-selling render Defendants liable for civil contempt.  For the reasons set forth above, the Court's order imposing the automatic stay in these Chapter 11 Cases has been plainly violated such that sanctions are warranted.  *See In re Sanchez*, 372 B.R. at 311 ("[T]he Court may issue sanctions under § 105(a) for contempt of an order imposing an automatic stay[.]"); *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365 (2007) (holding Section 105(a) grants bankruptcy judges "broad authority . . . to take any action that is necessary or appropriate to prevent an abuse of process") (internal quotation marks omitted).

17

43.     Moreover, punitive damages are appropriate pursuant to Section 362(k).  Under First, Defendants are all sophisticated brokers, dealers, banks and other professional nominees acting as agents for shareholders of countless companies, including the Debtors.  It defies credulity to believe they have not encountered the bankruptcy process in some form or another.  More still, several of the Defendants are Rule 2004 Firms and were thus made formally aware of the Chapter 11 Cases months before the instant action was filed.  Second, Defendants have openly admitted that they are allowing and facilitating illegal naked short-selling of Scilex stock as they publicly disclosed such information in the Broker Reports.  It is irrelevant whether Defendants "had a specific intent to violate the automatic stay, but only that the [Defendants'] actions violating the automatic stay were intentional."  *Sanchez*, 372 B.R. at 315 ("Even if the Defendant had a good faith belief in its right to the property, such belief is irrelevant.") (citing *In re Chesnut*, 422 F.3d 298, 302 (5th Cir.2005)).  Third, and for all the reasons explained above, Defendants' facilitating of illegal naked short-selling has violated the automatic stay.

44.     Based on the forgoing, Plaintiff submits that sanctions and punitive damages are appropriate as provided in the Proposed Order.

**III.    There is a Substantial Threat that the Debtors and Shareholders Will Suffer Irreparable Harm.**

45.     "To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986).  Instead, "[t]he plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id*.

46.     The harm the Debtors and their shareholders will suffer is imminent and irreparable in two primary ways.  First, if the improper short-selling of Scilex's stock is not policed, the

Debtors will continue to suffer irreparable injury to one of the Debtors' most valuable assets at a critical time in the Debtors' restructuring timeline.  If left unchecked, the Debtors' chances at a timely and value-maximizing reorganization will be severely and irreparably harmed, especially since Scilex's stock is a critical component of the Debtors' reorganization efforts.  This is made plainer by the fact that the actions sought to be enjoined are violations of the automatic stay and are destroying one of the Debtors' crown jewel assets.  Indeed, if the relief requested herein is not granted, Scilex's stock may never be able to recover its true value to the ultimate detriment of the Debtors' estates and their stakeholders.

47.     Second, as explained above, naked short-selling of Scilex stock has led to violent swings in the stock's price on the open market.  Thus, the Debtors face particular harm because the volatile nature of the price of the Debtors' chief asset has fueled uncertainty at a time when the Debtors' professionals are contemplating a possible monetization of Scilex's stock to fund the Debtors' reorganization.  The injunctive relief requested herein would effectively stabilize Scilex's stock price by eliminating illegal naked short-selling and would provide greater clarity as to the asset's likely value to the Debtors' estates and their restructuring efforts.

**IV.     The Threatened Injury to the Debtors and Shareholders
Outweighs the Threatened Harm to Defendants.**

48.     The balance of harms strongly favors an injunction and temporary restraining order.  The Equity Committee does not seek to permanently restrict Defendants with respect to any and all actions related to Scilex stock.  More still, Defendants have no specific identifiable interest in Scilex's stock as they merely hold the stock in custody as agents for the Debtors' shareholders, who are the true beneficial owners.

49.     The injunctive relief requested by the Equity Committee's Application will impose a minimal burden on the Defendants because: (i) it will be only temporary and only through the

conclusion of the Chapter 11 Cases; (ii) it is reasonably limited in scope as it pertains only to Scilex's stock and not the stock of any other entity; and (iii) the relief requested, if approved, would require minimal effort on the Defendants' part.  Indeed, no harm should come to Defendants in their simple compliance with their existing legal and regulatory obligations.  Any possible "harm" to the Defendants would only be triggered if Defendants refused to comply with the Court's order and are assessed the proposed penalty if provided therein.  The probable value destruction of Scilex stock greatly outweighs any such possible losses.

50.     Accordingly, the injunctive relief sought herein will greatly benefit the Debtors' estates and will not prejudice Defendants.

**V.     Granting of the Injunction Will Not Undermine the Public Interest.**

51.     In Chapter 11 cases, the public interest focuses on the interest in, among other things, "the unquestioned public interest in promoting a viable reorganization of the debtor." *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1008 (4th Cir. 1986); s*ee also In re Soundview Elite Ltd.*, 543 B.R. 78, 118 n.210 (Bankr. S.D.N.Y. 2016) (holding "[t]here is a strong public interest in avoiding the dissipation of corporate assets that rightfully should go to creditors or other stakeholders").

52.     The injunctive relief sought herein will serve the public interest by helping to maximize value for the Debtors' estates and bring market equilibrium to Scilex's stock price for the benefit of the Debtors and Scilex's investors.  Promoting the success of the Equity Committee's efforts to protect the *res* of the Debtors' property of the estate from diminution or destruction is clearly in the public interest.

53.     Moreover, and as noted herein, Regulation SHO was specifically enacted by the SEC to stop naked short-selling and abusive short-selling practices.  Thus, the public has a high

interest in ensuring all laws and regulations applicable to publicly traded stock are dutifully enforced.  The benefits of eliminating naked short-selling and its effects on Scilex's stock value would certainly be in furtherance of the goals for which such regulations were enacted by policymakers.

## **<u>CONCLUSION</u>**

54.     Plaintiff, the Official Committee of Equity Securities Holders, respectfully requests that the Court enter an order substantially in the form attached hereto as **<u>Exhibit A</u>** issuing a temporary restraining order and preliminary injunction for the reasons set forth herein.

[*Signature Page Follows*]

Dated: June 12, 2023

Respectfully Submitted,

**GLENN AGRE BERGMAN & FUENTES LLP**
By: */s/ Andrew K. Glenn*
Andrew K. Glenn (*pro hac vice*)
Kurt A. Mayr (*pro hac vice*)
Shai Schmidt (*pro hac vice*)
Richard C. Ramirez (*pro hac vice*)
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 970-1601
Email: aglenn@glennagre.com
kmayr@glennagre.com
sschmidt@glennagre.com
rramirez@glennagre.com

**<u>Certificate of Accuracy</u>**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

By: *<u>/s/ Andrew K. Glenn</u>*

**<u>Certificate of Service</u>**

I certify that, on June 12, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

By: *<u>/s/ Andrew K. Glenn</u>*